No. 97,936

STATE OF KANSAS, *Appellee,* v. BRANDON ANTOINE MCREYNOLDS *Appellant.*

(202 P.3d 658)

*Janine Cox,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke,* deputy district attorney, argued the cause, and *Jerome A. Gorman,* district attorney, and *Stephen N. Six,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Brandon Antoine McReynolds, the appellant, seeks review of his convictions and sentence for first-degree murder, aggravated robbery, and conspiracy to commit aggravated robbery.

On the night of August 12, 2005, Kansas City, Kansas, police responded to a report of a person lying on the ground next to a car. When the police arrived, they found a young man, Zhihai Cui, lying on the street. Cui was a delivery driver for a Chinese restaurant. The engine of his car was running and no other people were in sight. Money, food containers, and plastic bags were on the ground near him. The police called for medical personnel, who determined that he had stab wounds to his abdomen and chest. They declared Cui dead.

Detectives spoke with Tamara Ford, the appellant's 15-year-old cousin, who lived near the location where Cui was found. They also conducted a consensual search of Ford's house, where they found two knives, blood in the bathroom, and receipts from a Chinese restaurant. At the detective bureau, Ford provided the names of four juveniles whom she connected to the death: Cortez Ennis; Brandon Johnson; the 17-year-old appellant Brandon McReynolds; and his brother, Benjamin McReynolds.

Around 4 a.m. on August 13, detectives went to the home of Rhonda McReynolds, the mother of the McReynolds brothers. There they found Cortez Ennis asleep in a chair in the living room. In his pockets, they found restaurant receipts and money with blood on it. In a bedroom of the house, they found the appellant

and his brother sleeping and took them into custody. The appellant was wearing a T-shirt and boxer shorts when he left the house, and there appeared to be blood on his shirt. The appellant made an audiotaped statement that morning and another statement 3 days later. In his statements, the appellant admitted participating in an attack on Cui but denied making any life-threatening blows.

Following an interview with Cortez Ennis, detectives located a knife they believed to be the murder weapon under a bush near the murder scene. An examination of Tamara Ford's cell phone and an inquiry at Cui's place of employment showed that a caller using Ford's phone had placed an order on the evening of August 12.

The State filed an information and an amended information charging the appellant with one count of first-degree murder, K.S.A. 21-3401; one count of aggravated robbery, K.S.A. 21-3427; and one count of conspiracy to commit aggravated robbery, K.S.A. 21-3302.

Following a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), the district court granted the State's motion to admit the appellant's audiotaped statements made to detectives on the morning following the murder and 3 days later. In these statements, the appellant said that the four male youths called in an order for food delivery with the intention of robbing the delivery man, but when the driver arrived, the youths elected not to approach him. After one of the youths chastised the others, a second call was placed to the restaurant, and, when the driver arrived a second time, all four of the youths rushed at him. The appellant stated that he hit Cui with his fists, and the other youths attacked Cui with a stick, a crutch, and a knife. The youths made off with somewhat over 50 dollars, which they spent on drugs and alcohol and attending a party. The first statement concluded at 9:28 a.m., August 13, 2005, and the second statement concluded at 11:21 a.m., August 16, 2005.

Tamara Ford, testified at the trial that on the evening of the crimes the appellant, his brother, Cortez Ennis, and Brandon John-son were visiting the house where Ford lived with her mother. Cortez Ennis borrowed Ford's cell phone and made a call. The

five youths then went out onto the front porch. A car pulled up and, when the driver got out, the four male youths rushed at him and hit him until he fell. The four male youths returned to the house, and Ford told them to leave. Ford overheard the appellant say, "I fucked up," as he left her house.

The appellant denied any involvement in Cui's death. He testified at trial that he played football the day of the murder and got blood on his shirt from another player. Afterwards he went to the home of his aunt, Tabitha McReynolds, visited a friend's house, and then purchased PCP and Ecstacy at a local drug house. He later returned to his aunt's house, where he saw Ennis and Brandon Johnson chasing a man down the street. He thereupon went into his aunt's house because he was scared. Afterwards he smoked additional PCP, attended a party, and then returned to his mother's house.

During deliberations, the jury sent a note to the court requesting clarification:

"Even though we don't think Brandon McReynolds committed the murder, do we have to agree to find him guilty when we do agree that one of the other 3 did do it. By the claim on Inst. # 7 on the paper it is saying that even if we don't think he is the one who physcially [sic] did it, he will still be guilty of 1st degree murder."

The court directed the jury to compare the instruction defining the elements of first-degree murder with the instruction for aiding or abetting in the commission of a crime.

The jury found the appellant guilty of all three counts. The court sentenced him to a term of life imprisonment with no parole until he served 20 years for the murder, a concurrent term of 94 months for the robbery, and a consecutive term of 34 months for the conspiracy. He filed a timely appeal.

The appellant first contends the prosecution made an improper inference of guilt during voir dire and improperly impugned his honesty during closing arguments. Although no contemporaneous objections were lodged to these statements, a contemporaneous objection to alleged prosecutorial misconduct involving improper comments to the jury is not required in order to preserve the issue for appeal; an appellate court will apply the same standard of re-

view regardless of whether the defendant lodged an objection. *State v. Albright*, 283 Kan. 418, 428, 153 P.3d 497 (2007).

In general, appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury follows a two-step analysis. First, the appellate court decides whether the comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, the appellate court decides whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Albright*, 283 Kan. at 428.

In the second step of the two-step analysis, the appellate court considers three factors:

"(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. None of these three factors is individually controlling. Moreover, the third factor may not override the first two factors unless the harmless error tests of both K.S.A. 60-261 [refusal to grant new trial is inconsistent with substantial justice] and *Chapman v. California*, 386 U.S. 18, [22,] 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial], have been met. [Citations omitted.]" *State v. Albright*, 283 Kan. at 428.

It is unclear, however, whether this two-step analysis has been applied to comments made during voir dire such as those in the present case. Today, we hold this analysis is also properly applied to allegations of improper prosecutorial comments during voir dire.

During voir dire, one of the prosecuting attorneys, in distinguishing between civil and criminal trials, made the following statement:

"I'm sure most of you have heard that in criminal cases the burden of proof is proof beyond a reasonable doubt. That's the standard. In fact, that's the highest standard in the country anywhere. Proof beyond a reasonable doubt is as high as it gets.

. . . .

"And the reason why we have this really all goes back to our Constitution in which there is guaranteed to every person, that includes you and me, the judge, Mr. McReynolds, every person in America has the right to be presumed innocent

until proven otherwise. And what that means is that any person accused, *whether they're guilty or not*, has a right to have a jury trial, *even guilty people*. If someone would come in here and shoot me dead in front of all you guys and we have 50 some witnesses to that, that person still is entitled to their day in court. They have a right to have a trial by a jury of their peers. And the reason is because they are presumed innocent until the State proves them otherwise. It's the State's burden of proof." (Emphasis added.)

The appellant argues that the prosecutor's statement undermined the presumption of innocence by suggesting he was guilty before the trial had commenced. He contends, because of the presumption of innocence, no defendant is guilty, as a matter of law, until a guilty verdict has been entered.

The prosecutor's statement was not outside the bounds of permissible statements. Even if the reference to guilty people deserving a fair trial was, in isolation, a technically inaccurate statement of the law, the entire statement clearly placed the burden on the State to prove guilt and clearly articulated the presumption of innocence.

In *State v. McCorkendale*, 267 Kan. 263, 276, 979 P.2d 1239 (1999), the prosecutor asked during voir dire, "Does everybody know that Mr. McCorkendale is entitled to a jury trial even if he knows he's guilty?"

This court held:

"[I]t is apparent that the State, albeit unartfully, was attempting to convey to the prospective jury that every accused person is entitled to trial by impartial jury. We note that there was no objection to the State's comment, which would have given the trial court the opportunity to address the defendant's concern. We also note that immediately following this comment, the State informed the jury that it 'has the burden of proof, we have to prove him guilty to a jury of his peers beyond a reasonable doubt.' In light of these following comments, and the entire voir dire consisting of approximately 100 pages, we conclude that the State's comment provides no basis for reversal of the defendant's conviction." 267 Kan. at 276.

The voir dire in the present case consisted of 150 pages of transcript; there was no objection to the comment; and the allegedly improper comment and subsequent qualification are similar to the statement in *McCorkendale*. Indeed, they appear to have been made by the same prosecutor as in that case. While the appellant

makes a valid point that the statement, in isolation, undermines the presumption of innocence, it does not appear that the prosecution emphasized the appellant's guilt or attempted to shift onto him the burden of proof. As in *McCorkendale*, albeit inartful and hopefully not revisited phraseology, the comment does not warrant reversal.

During closing argument, the prosecution stated to the jury,

"No police officer benefits from this investigation, no police officers benefit from concocting stories and making Mr. McReynolds agree to those stories. There's only one person in the courtroom right now who benefits from coming into this room, concocting a story and testifying under oath about that and you know who that person is."

The appellant contends that this statement insinuated that he was lying and that the police were telling the truth. The State contends that the statement was nothing more than a legitimate rebuttal to the appellant's closing argument that the police coerced false confessions from him and from Tamara Ford.

In general, prosecutors may not offer juries their personal opinions as to the credibility of witnesses. Prosecutors have wide latitude, however, to craft arguments that include reasonable inferences to be drawn from the evidence. That latitude includes explaining to juries what they should look for in assessing witness credibility, especially when the defense has attacked the credibility of the State's witnesses. *State v. Scaife*, 286 Kan. 614, 623-24, 186 P.3d 755 (2008). No prejudicial error occurs where the questionable statements by a prosecuting attorney are provoked and made in response to prior arguments or statements by defense counsel. *State v. Murray*, 285 Kan. 503, 517, 174 P.3d 407 (2008).

During closing argument, counsel for the appellant commented at length on coercive tactics allegedly used by the police in obtaining statements from Tamara Ford and the appellant. When a defendant has told one story during interrogation and a completely different story at trial, it would be difficult for a prosecutor to comment on the evidence without suggesting that untruths existed. See *State v. Donaldson*, 279 Kan. 694, 707, 112 P.3d 99 (2005). Detective Lawson had denied using coercion beyond admonishing the two youths that they would be better served by telling the truth.

Because the credibility of the State's witness had been challenged, the prosecutor properly offered the jury an explanation of "what it should look for in assessing witness credibility." *Scaife*, 286 Kan. at 624. These comments were within the latitude allowed prosecutors when commenting on the evidence. It is unnecessary to reach the second step of the prosecutorial misconduct analysis.

The appellant next challenges the introduction of his audiotaped statements made to Detective Lawson. The State filed a motion seeking to admit the statements that the appellant made to police shortly after the murder. The trial court granted the motion over the appellant's objection, and the jury heard the tapes and followed written transcripts of the tapes. The appellant contends on appeal that the statements should not have been admitted.

When this court reviews a decision regarding suppression of statements to the police, it applies a substantial competent evidence standard to the factual underpinnings of the trial court's decision and applies a de novo standard to the ultimate legal conclusion. This court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence. *State v. Johnson*, 286 Kan. 824, 835-36, 190 P.3d 207 (2008).

The voluntariness of a confession is determined under the totality of the circumstances. The State has the burden of proving that a confession is admissible, and it must prove admissibility by a preponderance of the evidence. The essential inquiry is whether the statement was the product of the defendant's free and independent will. *Johnson*, 286 Kan. at 836.

The court is to consider numerous factors when determining whether a statement was voluntary. A nonexclusive list of those factors includes the defendant's mental condition; the manner and duration of the interrogation; the ability of the defendant to communicate with the outside world; the defendant's age, intellect, and background; the fairness of the officers in conducting the interrogation; and the defendant's proficiency with the English language. *Johnson*, 286 Kan. at 836; see *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007).

Before each interview, the appellant was informed of his *Miranda* rights, which the police explained to him in some detail. The

appellant had been in custody for about 5 hours when he made his first taped statement at around 9 a.m. He was taken into custody wearing a T-shirt and his undershorts and remained clothed only in those items during the first interview and taped statement.

The appellant's mother testified that based on his eyes and his slow speech, the appellant appeared to be intoxicated when she saw him around midnight the night of the murder. The appellant testified that the evening before the interview he had smoked PCP mixed with marijuana and had ingested half of an Ecstacy tablet and two fifths of Hennessy cognac. He testified that he was not "in the right frame of mind" when he signed the waiver of his rights and when he made the first taped statement. He stated that his intoxication prevented him from understanding his rights and caused him to agree with all the suggestions the detectives made to him.

Detective Lawson, on the other hand, testified that, at the time of the interview, the appellant showed no signs of intoxication or being under the influence of drugs. Detective Lawson testified that he made no threats and used no abusive language or tactics in obtaining the statements.

The trial court found that the appellant gave both statements freely and voluntarily. The court found Detective Lawson to be the most credible witness about the appellant's mental capacity.

The appellant apparently raises two challenges to the admissibility of his statements. First, he argues that his statements were not freely and voluntarily made. Second, he argues that the trial court impermissibly relied on its opinion of the interviewing detective's past credibility.

The appellant challenges the admissibility of his statements under almost all of the factors enumerated in *State v. Walker*: his mental condition, the manner and duration of the interrogation, his ability to communicate with the outside world, his age, and the fairness of the officers conducting the interrogation. He emphasizes that his mental condition was impaired by drugs and alcohol, that he was interrogated over a period of several hours, and that he was still wearing nothing but a shirt and undershorts during the interrogation.

The trial court found that the statements were freely and voluntarily made. The trial court heard the testimony of the interviewing detective and the testimony of the appellant and his mother. The court also heard the statements by the appellant and considered the written waivers of rights. The two statements were made with an interval of 3 days between them, and the statements were generally consistent. The appellant testified at trial that the effects of PCP wear off after an hour or two. The appellant accurately provided the detective with his telephone number, his birthday, and his residential address during both interviews.

Although the appellant implicates a number of factors that may undermine the voluntariness of a confession, the record does not provide a basis for reversing the trial court's findings. On the contrary, a review of the record suggests the appellant was lucid, articulate, consistent, and calm when making both statements and that there is substantial competent evidence to support the trial court's decision to admit the statements.

The appellant also challenges the trial court's reliance on previous testimony by Detective Lawson. The trial court observed that it had found Lawson to be a credible witness in past cases. The judge stated:

"Detective Lawson has testified in this court a number of times on these issues and the Court has found Detective Lawson in the past to be a very credible witness, that Detective Lawson will freely say things that may not necessarily be in the State's best interest, but that he has always been an exceptionally honest witness in this Court's view and there's nothing that's occurred here today that would cause my mind to be changed."

In general, previous statements by a witness, even in the same case, may not be used to bolster the credibility of that witness. See, e.g., *Donaldson*, 279 Kan. at 709; *State v. Whitesell*, 270 Kan. 259, 290, 13 P.3d 887 (2000); *State v. Fouts*, 169 Kan. 686, 696, 221 P.2d 841 (1950); *State v. Kackley*, 32 Kan. App. 2d 927, 935, 92 P.3d 1128, *rev. denied* 278 Kan. 849 (2004). In any event, it is incumbent on the court to rely on the evidence presented in the case before it and not on its impression of a witness' credibility based on testimony presented in previous cases.

This is perhaps the most serious assertion of fault raised by the appellant. The appellant's taped statements, which were at odds with the appellant's theory and testimony at trial, must have been highly persuasive to the jury. If the trial court had excluded those statements, it is conceivable that the jury might have found the appellant not guilty or perhaps guilty of lesser crimes. The trial court's reference to Detective Lawson's credibility in other cases was not merely passing; it was made at some length and in some detail.

On the other hand, as we found above, the record contains ample evidence suggesting that the appellant's statements were freely and voluntarily made. This evidence includes, in addition to the detective's comprehensive testimony, the appellant's demeanor on the tapes, the factual consistency between the tapes, the waivers of rights that were explained in detail, the verifiable factual accuracy of certain parts of the statements, and the passage of time between the first taped statement on the morning after the crime and the second taped statement 3 days later. The totality of the circumstances supports the trial court's determination that the statements were freely and voluntarily made. It therefore appears that the trial court's comment on Lawson's credibility was more in the nature of surplus verbiage and less in the nature of an independent, compelling reason for admitting the statements. While the trial court's comment was unnecessary, it did not amount to reversible error. The decision to admit the appellant's statements rests upon substantial competent evidence.

The appellant next complains that the trial court erred in failing to grant his motion for a mistrial made during the testimony of Detective Lawson, as well as his motion for a new trial made following the proceedings. A motion for mistrial, like a motion for a new trial, is reviewed under an abuse of discretion standard, and the party alleging the abuse bears the burden of proving that his or her substantial rights to a fair trial were prejudiced. *State v. Albright*, 283 Kan. at 425-26; *State v. Kirby*, 272 Kan. 1170, 1192, 39 P.3d 1 (2002).

Detective Lawson testified at trial about his station interview of Ford, who initially incriminated the four male youths, and his sta-

tion interview of the appellant and a subsequent juvenile detention center interview of the appellant. On cross-examination, the detective mentioned statements made by the appellant's brother, Benjamin, although Benjamin's statements were not introduced at trial.

Defense counsel made an oral motion for a mistrial, asserting that the detective had introduced impermissible hearsay testimony to the jury. The trial court found the detective's answers came within the scope of the open questions being asked on cross-examination and denied the motion. Defense counsel renewed the issue in a posttrial motion for new trial, which the trial court denied.

In answering questions, Detective Lawson made three vague references to the consistency of the appellant's stories related during his interrogation with the stories related by others, including the appellant's brother. The cross-examination questions were directed toward the interrogation techniques and whether the detective had referred to the interrogations of the other youths to manipulate the appellant's responses. The detective testified that at the beginning of the interrogation he had not yet talked with Tamara or with the appellant's brother, but that he later confronted the appellant with inconsistencies between his story and the stories that others were telling. "I told him his story didn't jive with Tamara's nor his brother's or some other people involved." "What I'm saying is that I told him that not only had Tamara and, you know, his brother and other people told us what had been going on is that, you know, I mean everybody's stories, you know, I mean within the situation were kind of consistent."

The trial court found that the questions were open-ended and allowed a broad range of responses. This finding is correct; it is difficult to ascertain specifically what some of the questions posed on cross-examination were asking. In addition, the references to the brother's statements were fleeting and did not identify any admissions or factual allegations that may have been contained in those statements. The jury could reasonably have inferred that the brother told the police *something* since it knew from previous testimony that he was arrested at the same time as the appellant. The

record is silent as to what he actually told the police, except that it may have differed in some fashion from what the appellant and Tamara initially told the police.

The appellant has not demonstrated prejudice to his substantial rights as a consequence of Detective Lawson mentioning statements by his brother, nor did the trial court abuse its discretion in refusing to grant a mistrial.

Finally, the appellant argues that trial errors, considered cumulatively, were so great as to require reversal of his conviction. The standard is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found under the cumulative error rule if the evidence is overwhelming against a defendant. *State v. Nguyen*, 285 Kan. 418, 437, 172 P.3d 1165 (2007).

Cumulative error will not be found when the record fails to support the errors raised on appeal by the defendant. *State v. Davis*, 283 Kan. 569, 583, 158 P.3d 317 (2007); *State v. Jones*, 283 Kan. 186, 218, 151 P.3d 22 (2007). One error is insufficient to support reversal under the cumulative effect rule. *State v. Nguyen*, 285 Kan. at 437.

No error of substance occurred in the course of the trial. The evidence against the appellant, especially his taped statements acknowledging his participation in the planning and execution of the fatal robbery, corroborated by other evidence introduced at trial, is overwhelming and provides no grounds for reversal.

The trial court sentenced the appellant to a guideline sentence that was in the aggravated range for conspiracy to commit aggravated robbery. The appellant contends on appeal that imposition of the high end of the sentencing grid without submitting the grounds for an aggravated sentence implicates constitutional provisions for trial by jury.

Interpretation of a sentencing statute is a question of law, and the appellate court's standard of review is unlimited. *State v. Ruiz-Reyes*, 285 Kan. 650, 653, 175 P.3d 849 (2008). The constitutionality of a sentencing statute is a question of law over which this court has unlimited review. *State v. Allen*, 283 Kan. 372, 374, 153 P.3d 488 (2007).

This court has recently addressed this issue and has taken a position adverse to the appellant's argument: "A sentence to any term within the range stated in a Kansas sentencing guidelines presumptive grid block does not violate *Cunningham v. California,* 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007), or *Apprendi v. New Jersey,* 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000)." *State v. Johnson,* 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008); see *State v. Gallegos,* 286 Kan. 869, 879, 190 P.3d 226 (2008).

The appellant was assigned a criminal history score of D based on a previous conviction of robbery. He contends on appeal that the facts supporting the determination of his criminal history were not submitted to the jury and therefore could not be used to raise his criminal history score from I to D.

This court has repeatedly addressed this issue, consistently reaching the same result. The issue was initially addressed in *State v. Ivory,* 273 Kan. 44, 41 P.3d 781 (2002), and was decided adversely to the appellant. The appellant argues, however, that *Shepard v. United States,* 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005), has modified the constitutional interpretation on which *Ivory* relied. The appellant overlooks that cases decided subsequent to *Shepard* have reaffirmed the *Ivory* holding. See *James v. United States,* 550 U.S. 192, 167 L. Ed. 2d 532, 127 S. Ct. 1586 (2007); *State v. Storey,* 286 Kan. 7, Syl. ¶ 4, 179 P.3d 1137 (2008); *State v. Farmer,* 285 Kan. 541, 555, 175 P.3d 221 (2008); *State v. Holt,* 285 Kan. 760, 777, 175 P.3d 239 (2008); *State v. Gaither,* 283 Kan. 671, 693, 156 P.3d 602 (2007); *State v. Hawkins,* 40 Kan. App. 2d 10, 19, 188 P.3d 965 (2008).

The appellant has established no grounds for reversal of his convictions for first-degree murder, aggravated robbery, and conspiracy to commit aggravated robbery, nor for any modification of his sentence. The same are affirmed.

Affirmed.